GEORGIA-FLORIDA LAND CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31095. Promulgated June 29, 1929.

*Preston D. Orem, C. P. A.*, for the petitioner.
*L. L. Hight, Esq.*, for the respondent.

1254

### OPINION.

LOVE: The sole question for the determination of the Board is whether the tax upon the sales of real estate made by this petitioner in 1924 should be computed upon the basis of "sales of property on the installment plan," or "deferred payment sales not on the installment plan."

Counsel for the respondent introduced in evidence the petitioner's tax returns for 1924 and 1925, but made no argument at the hearing and no brief in this case has since been filed for the respondent.

The sales made in 1925 are admitted by the petitioner to have been reported as "installment sales," and counsel says that as this Board has ruled in *Gilbert W. Lee*, 6 B. T. A. 135, that an election to report on installment basis is binding, the petitioner will not contest that point before the Board.

In regard to the one sale made in 1924 to M. E. Pelot for $235,625, it is alleged in the original petition that the transaction was "reported on deferred payment basis." In the amended petition filed by order of the Board, as well as in the original, the allegation of error is based upon "the failure of the Commissioner to allow the taxpayer to report the sales of real estate parcels during 1924 and 1925 upon the 'deferred payment' basis as authorized by the Revenue Act of 1926 and Regulations 69." The amended petition contends, also, "that the profit upon the sales of real estate should be computed upon the 'deferred payment' basis (cash receipts and disbursements) * * *."

From these somewhat meager averments and contentions on the part of the petitioner, the exact point that counsel was endeavoring to establish is not altogether clear. The testimony of the only two witnesses who were heard was entirely directed toward proving that the mortgage and mortgage notes which were received by the petitioner in this transaction, as well as the land itself, were wholly without "fair market value." The petitioner seems to regard the "'deferred payment' basis" as equivalent to "cash receipts and disbursements." That is not the law. The basis prescribed in the law is "the taxpayer's annual accounting period" for the determination of net income in accordance with the method of accounting regularly employed in keeping the books of the taxpayer, provided that such method clearly reflects his income. In practice two general methods of reporting net income are recognized and well understood—that of "cash receipts and disbursements," and the so-called "accrual" method.

Sales on the installment plan may be reported under either of the foregoing methods, in accordance with that in which the books of the taxpayer are kept.

The Revenue Act of 1926, in section 212 (d), provides:

Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the total profit realized or to be realized when the payment is completed, bears to the total contract price. In the case * * * (2) of a sale or other disposition of real property, if * * * the initial payments do not exceed one-fourth of the purchase price, the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this subdivision. As used in this subdivision the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

Petitioner's income-tax return for 1924 and both the original and amended returns for 1925, contain the declaration that they are not made on the basis of actual receipts and disbursements, but upon the accrual basis; that is to say, that the transaction of 1924 in controversy was reported not as an installment sale, but as a completed transaction. From the tax returns before us, we hold that declaration to be in accordance with the facts, the transaction being fully set forth in detail in the 1924 return.

From that return and from the pleadings it appears that 725 acres of land and a club house were sold to M. E. Pelot for $235,625 and that " before the deal with the taxpayer had been closed," Pelot resold the property to Walter McNeill for $271,875, the purchase price being paid $35,000 in cash and $236,875 in McNeill's mortgage notes.

Schedule B attached to the petitioner's tax return for 1924, contains the following tabulation:

| | Equity of Georgia- Florida Land Co. | Equity of M. E. Pelot |
|---|---|---|
| Cash | $35,000.00 | $30,334.50 | $4,665.50 |
| Notes receivable due: | | | |
| Apr. 10, 1925 | 19,375.00 | 16,790.50 | 2,584.50 |
| Oct. 10, 1925 | 43,500.00 | 37,700.00 | 5,800.00 |
| Oct. 10, 1926 | 43,500.00 | 37,700.00 | 5,800.00 |
| Oct. 10, 1927 | 43,500.00 | 37,700 00 | 5,800.00 |
| Oct. 10, 1928 | 43,500.00 | 37,700.00 | 5,800.00 |
| Oct. 10, 1929 | 43,500.00 | 37,700.00 | 5,800.00 |
| | 271,875.00 | 235,625.00 | 36,250.00 |

The notes were not before us and we have only the circumstantial evidence of the tax return, and the statements contained therein and in the pleadings as to the maker's identity and the payee. It seems certain, however, that they were not the notes of Pelot to this petitioner and, that being so, it is immaterial whether they were drawn

by McNeill to the petitioner in novation, or by McNeill to Pelot and transferred to the petitioner by endorsement; they assuredly were not "evidences of indebtedness of the purchaser," Pelot, as contemplated by the law. See *J. W. Elmore*, 15 B. T. A. 1210. They were a part of the "initial payments," the payments received "in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made."

These conditions immediately raise the question as to the fair market value of the notes received. Admittedly, the determination is not without difficulty. The petitioner does not deny that the notes had some value, but does deny that they had a "fair market value." To sustain this contention, the petitioner put on the stand two witnesses—E. P. Green, president and general manager of the Georgia-Florida Land Co.; and Stephen H. Fifield, assistant to the president of the First National Bank in Bradenton. Fifield has been in the banking business for approximately twenty-five years, and corroborated Green's testimony in every respect. It will not be necessary again to refer to this witness.

In addition to this connection with the petitioner, Green is in the real estate and insurance business, was vice president and a member of the executive board of the Bradenton Bank & Trust Co. in the early years, and is at present a director in the First National Bank and has had something to do with its loans, having been on the loan committee several times. He is also vice president of the First Trust Co. of Bradenton, which handles mortgages and loans. He has been in the real estate business in Bradenton about 20 years and was familiar with the market for first mortgages on unimproved property in Florida in 1924 and 1925. In those years the petitioner employed twelve to eighteen salesmen, with sales which ran probably from two to three million dollars. They had one subdivision where the sales amounted to more than one million dollars.

In regard to the 725 acres here under consideration, Green testified that about one-half of it is what is known as "flats." It had no agricultural value, for it could not be cultivated. It was situated at low-water mark, where the tide ebbs and flows twice in every twenty-four hours, and at times the tidewater would cover about 50 per cent of the land. Without improvement, it was not suitable, in his opinion, for any purpose. In regard to the other half of the land, something like 300 acres of it could be used for the purposes of agriculture. It was a low grade of agricultural land and at that time it was wild and unimproved. Sixty days before the property was sold to Pelot, a prospective purchaser in Boston held this 725 acres under option at $140,000; but when he had an estimate made and dis-

covered that it would cost him $700,000 or $800,000 for improvements, he refused to buy it.

In regard to the mortgage notes received in this transaction, the first two, falling due in 1925, in which the petitioner's equity was $54,490.50, were apparently paid in full. The witness testified on cross-examination that the third payment due in 1926 was defaulted. No further payment has been received, the property has since been sold for taxes, and no further collection whatever has been made. Dun's agency has reported unsatisfied judgments of record against the purchaser, Pelot. Such testimony in regard to conditions subsequent would not be competent for our consideration if given under direct examination over objection, but it was brought out by counsel for the respondent in confirmation of matters to which the witness had already testified, and we believe that it may properly be considered at least as a sidelight on the abnormal conditions existing at the time of the transaction.

On direct examination, Green testified that the fair market value of this property, averaging the inferior moiety of it with the better, was $100 an acre, basing his opinion on his long experience with similar properties in that vicinity and the fact that other smaller parts of this 900-acre tract had been sold at that figure about that time. As a banker, familiar with conservative banking practice, he held that the unindorsed notes received in part payment for it had no fair market value. They were based upon wild land, unimproved real estate that produced no income, and they were not considered bankable paper.

Upon cross-examination he testified that he had never tried to dispose of these notes anywhere on the market, he had never made any effort either to sell the notes outright or to obtain a loan upon them. There had been no necessity, his company did not need the money; but he knew that, as a matter of fact, they were not marketable at that time; that no institution in Bradenton would have handled the paper, although he could have borrowed money on it with his indorsement. The mortgage had land behind it of a larger value than the cash payment that had been made and value enough to cover the second and third payments of more than $54,000. He thought that its value was "just about $80,000;" that after the payments aggregating $84,825 had been received, his company still had the mortgage under which it could have repossessed the property; and that the mortgage still had "a value" up to the time when the 1926 payment became due and was defaulted.

In order to arrive at a fair determination in the issue here presented for consideration, the Board must take brief notice of the situation as it then existed in regard to Florida real estate. If not

unique, it was almost unprecedented, and the wild speculation in real estate prices was altogether without regard to actual values. It was closely allied to that which has taken place, and still takes place from time to time, in oil and gas territory, with this difference, that in the latter case there is always the possibility that the unexplored earth actually contains vast realizable, though unseen and unknown, wealth; while in the case of Florida, the speculator's only hope was that he might speedily find some one to take the property off his hands at a material profit. The business was transacted largely " in paper " of irresponsible makers, which, at and after the deflation of the boom, was disposed of, if disposed of at all, at any price that the holder could get, and to any one who was willing to take it over.

Under such circumstances, a " fair market value " is a difficult thing to determine; but it can be more readily measured in the community where the property is located and the makers of the instruments more or less known, than elsewhere. That there was no market for this paper in Bradenton is, we think, reliably established, and it is not to be presumed that in order to find such a market, there is any burden upon the taxpayer to " hawk " the mortgage notes up and down the length and breadth of the State of Florida. We regard it as significant, too, that no effort was made to dispose of these notes. The business of this petitioner was, among other things to buy real estate and to sell it at a profit. It does not seem unwarranted presumption that if these notes had ever had a "fair market value" not given to them by indorsement, at any figure even approximating their face value, they would long ago have been disposed of without recourse.

We know, however, that these notes had a value at the time of the transaction. Of this value $54,490.50 was realized in 1925 on this petitioner's equity in them, and the president of the corporation testified that the mortgage behind them still had " a value " until the default occurred in 1926. Giving due weight, as nearly as may be, to all the considerations here involved, we find that the petitioner's equity in these notes had, at the time the transaction was closed in 1924, a fair market value of $70,000, and that the initial payments received in cash or property other than evidences of indebtedness of the purchaser amounted to $100,334.50, which exceeds one-fourth of the purchase price of $235,625. The income accruing from such sale may not, therefore, be reported by the taxpayer nor computed by the Commissioner upon the installment plan. We confirm the petitioner's election and direct that this sale be treated as a deferred payment sale not on the installment plan, and that the tax for 1924 and 1925 be recomputed accordingly.

*Judgment will be entered under Rule 50.*