**WEST SHORE FUEL, INC., Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**Ruth A. KOLB, Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 655, Docket 78–6021.**

United States Court of Appeals, Second Circuit.

Argued Feb. 21, 1979.

Decided April 23, 1979.

David Sweet, Heffernan, Sweet, Murphy & Flierl, Buffalo, N. Y., for appellants.

Jonathan S. Cohen, Tax Div., Dept. of Justice, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Timothy B. McBride, Attys., Tax Div., Dept. of Justice, Washington, D. C., Richard J. Arcara, U. S. Atty. for the Western District of New York, Buffalo, N. Y., of counsel), for appellee.

Before LUMBARD, OAKES, and VAN GRAAFEILAND, Circuit Judges.

OAKES, Circuit Judge:

■ The question when income is taxable under the intricate provisions of the Internal Revenue Code is seldom a simple one. The income here consisted of gain that the taxpayers realized on the disposition of their stock in the American Steamship Company for cash and notes of an acquiring corporation. The question is whether the notes constituted "evidences of indebtedness of the purchaser," in which case taxpayers are entitled to report their gain on an installment basis under Section 453 of the Internal Revenue Code,[1] or instead con-

---

1. At the time of the transaction, I.R.C. § 453 provided in part:

(b) *Sales of Realty and Casual Sales of Personality.*—

  (1) *General rule.—Income from—*

    (A) a sale or other disposition of real property, or

    (B) A casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000.

stituted "payments" in the taxable year of sale which, when coupled with the cash that constituted 30% of the purchase price, disentitled taxpayers from taking the benefits of Section 453 and instead made all of the gain taxable in the year of disposition. The issue, in other words, is whether the acquiring corporation was the "purchaser" of the taxpayers' stock. Resolution of that question depends on the proper characterization of the underlying corporate transaction. The taxpayers argue that because the transaction took the form of a merger under state law,[2] the acquiring corporation was the direct purchaser of the taxpayers' stock. But the United States District Court for the Western District of New York, John T. Curtin, Chief Judge, held that in substance the underlying transaction was a sale of American Steamship Company's assets to the acquiring corporation for its cash and notes, followed by a liquidation in which the taxpayers as stockholders of American received the cash and notes of the acquiring corporation as a liquidating distribution.[3] On this interpretation, American Steamship Company, not the acquiring company, was the "purchaser" of the taxpayers' stock. We agree with this interpretation and consequently affirm the judgment of the district court dismissing the taxpayers' suits for a refund of income taxes.

## BACKGROUND

Two taxpayers brought suit, alleging that the Internal Revenue Service improperly disallowed their election to report the income in question on an installment basis. One, West Shore Fuel, Inc., sued for refund of taxes for a fiscal year ending July 31, 1967, and the other, Ruth A. Kolb, for the calendar year ending December 31, 1967.[4] As of March 1, 1967, the taxpayers owned 160 and 2 shares, respectively, of the stock of American Steamship Company (Old American), a New York corporation. On that date, pursuant to a previously executed plan, Old American was acquired by Oswego Steamship Corporation (Oswego), also a New York corporation, which as the surviving corporation in the merger changed its name to the American Steamship Company (the survivor is hereinafter sometimes referred to as New American). Under the plan, shareholders of Old American received for each share of stock a consideration of $1,950, of which 30% or $585 was paid in cash and the balance was paid in promissory notes of New American, one in the principal amount of $1,235.96 with a maturity period of three years and the other in the amount of $129.04 with a maturity period of ten years.

The facts leading up to the transaction in question may be briefly stated as follows. Old American was engaged in the ownership and operation of ships on the Great Lakes. Oswego Shipping Corporation (Oswego Shipping) became interested in acquiring Old American to obtain a fleet of vessels capable of operating on the Great Lakes, in order to expand its business in general and to take advantage of its business contacts with ocean shippers who wanted to use Great Lakes facilities. Oswego Shipping established Oswego as a New York subsidiary. H. Lee White, chief executive officer of Oswego Shipping, approached the directors of Old American and

---

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

 (2) *Limitation.—Paragraph (1) shall apply—*
 (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—
 (i) there are no payments, or
 (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

Because of subsequent amendments to the statute, the critical language in § 453(b)(2)(A)(ii) is now contained in § 453(b)(2)(B), but the language itself is unchanged.

**2.** N.Y.Bus.Corp. Law §§ 901–904, 906 (McKinney Supp.1978).

**3.** *West Shore Fuel, Inc. v. United States*, 453 F.Supp. 956 (W.D.N.Y.1978).

**4.** Appellants are 2 out of 48 former shareholders of American Steamship Company seeking tax refunds on the same theory as alleged here.

orally offered either to purchase the assets of Old American for a price equivalent to $2,100 per share, with the stockholders to assume the burden of any and all known or contingent liabilities, or alternatively to buy all the outstanding stock of the corporation at a price of $1,900 per share. The members of the executive committee of Old American then recommended that the directors submit a counterproposal for the sale of the stock of the company at a price of $1,950 per share with any contingent liabilities to be assumed by the purchaser and without any warranties by the officers, directors, or shareholders of Old American. Mr. White responded with a proposal for a statutory merger under New York law, *see* note 2 *supra*, with the stockholders receiving a consideration of $1,950 in cash and notes if holders of two-thirds of the stock voted in favor of the plan. Old American's directors accepted this proposal, and the plan of merger and liquidation was consummated when holders of approximately 80% of Old American's outstanding stock voted in the plan's favor.

The final approved plan spelled out the consideration that the stockholders of Old American would receive for their stock. The plan also provided that on the effective date of the merger Old American would cease to exist and would be merged and liquidated into New American which, as the surviving corporation, would "continue the businesses of the combined constituent corporations" under Old American's corporate name. The plan further significantly provided:

Upon consummation of the merger and liquidation, all of the rights, privileges, immunities, powers and purposes, and all of the property, real and personal, causes of action and every other asset of the Company and the Buyer shall be acquired by and vest in the Surviving Corporation, and the Surviving Corporation shall assume and be liable for all the liabilities, obligations and penalties of the Company and the Buyer.

On January 10, 1968, after the merger and distribution to shareholders had been consummated and after West Shore Fuel, Inc., had filed its tax return but before Kolb had filed her return, the National Office of the Internal Revenue Service issued a so-called technical advice memorandum to the District Director of Buffalo, New York, concluding that the surrender of Old American stock for New American cash and notes constituted a sale of the stock and did not constitute a "reorganization" within the meaning of I.R.C. § 368(a)(1).[5] The memorandum also concluded that the "sale may be reported on the installment basis" and that the "notes will be considered to be evidences of indebtedness of the buyer." In the meantime, however, Old American had reported the transaction on its final income tax return as a sale on March 1, 1967, of the assets of Old American to Oswego, together with a liquidating distribution on that date of cash and notes to Old American stockholders. Thus Old American treated the transaction as a sale of assets and liquidation which, under I.R.C. § 337,[6] resulted in no recognition of any

---

**5.** I.R.C. § 368 provides in part:
*Definitions Relating to Corporate Organization—*
  (a) *Reorganization.—*
    (1) *In general.—*For purposes of parts I and II and this part, the term "reorganization" means—
    (A) a statutory merger of consolidation;

. . . . .

**6.** I.R.C. § 337, prior to its amendment by the Act of Oct. 4, 1976, Pub.L. No. 94–455, § 1901(a)(46), 90 Stat. 1772, provided in relevant part:
  (a) *General Rule.—If—*
    (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

    (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,
  then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.
Of course with respect to the stockholders, I.R.C. § 331(a)(1) provides that "[a]mounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock."

gain or loss to the corporation.[7] Following an audit of Old American's final return, the District Director requested the National Office to reconsider its previously issued technical advice memorandum of January 10, 1968. On March 11, 1970, the National Office retroactively revoked that ruling and determined that the overall transaction was properly to be treated as it had been in Old American's final return, viz., as a sale of assets by Old American coupled with a liquidation and distribution to Old American's stockholders of the cash and notes of New American. The National Office memorandum then concluded that the shareholders had received third party notes, not notes of the purchaser, and that the notes thus constituted "payments in the year of sale," disqualifying the transaction from installment sale treatment under the terms of I.R.C. § 453.

## THE MERITS

Taxpayers make two contentions: first, that the Government could not retroactively revoke its January 10, 1968, ruling that Old American shareholders were entitled to report the gain on the sale of their stock by the installment method; and second, that installment treatment was proper on the theory that New American, the obligor on the notes, was the "purchaser" of shares of stock sold through the medium of a statutory merger because this was the expressed intent of the parties and because as a matter of economic reality Old American shareholders sold their stock to New American and directly received cash and notes in exchange.[8]

The first contention may be dealt with summarily. The technical advice of January 10, 1968, was not a prospective ruling on which the taxpayers relied in structuring the underlying transaction but rather was an after-the-fact ruling pertaining only to the method of accounting for a closed transaction. Thus the taxpayers were in no sense prejudiced by the retroactive revocation. Indeed, it is quite clear that the Commissioner may retroactively correct a mistake of law in his rulings even if a taxpayer *has* detrimentally relied, unless the retroactive change amounts to an abuse of discretion. *Dixon v. United States*, 381 U.S. 68, 73–75, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965). We find no such abuse, as well as an absence of prejudice, here. Accordingly, we pass to the merits.

Before 1926 the right of a taxpayer to report on the installment plan rested only on Treasury Regulations. When the Board of Tax Appeals held that these regulations were without statutory support, *B. B. Todd, Inc.*, 1 B.T.A. 762 (1925), Congress in Section 212(d) of the 1926 Revenue Act permitted the taxpayer to elect to report income on an installment basis in very similar terms to the Treasury Regulations. *See generally Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 502–03, 68 S.Ct. 695, 92 L.Ed. 831 (1948). The purpose of permitting installment treatment was to alleviate the hardship that would confront a taxpayer who sold property and received only a small percentage of the consideration in the form of cash or marketable property in the year of sale, for under ordinary accounting principles the realized gain from the entire consideration would be fully tax-

---

**7.** In their reply brief, the taxpayers appear to advance the novel argument that Old American may have reported its income as it did on its final tax return to take advantage not of I.R.C. § 337 but of I.R.C. § 332, which provides that a corporation does not recognize gain or loss on the receipt of property distributed in complete liquidation of another corporation. But this section only applies to liquidations of *subsidiaries*, and Old American was clearly not a subsidiary of New American (or Oswego) within the terms of § 332(b), because at the time the plan of liquidation was executed (March 1,

1967) New American did not own 80% of the combined voting power of Old American stock.

**8.** The court below considered the alternative theory that the shareholders rather than Old American should be deemed to have sold the corporate assets to Oswego, but the court found that the transaction had been negotiated between Oswego and Old American and that the sale of assets was by Old American itself. Taxpayers do not advance this alternative contention in this court, and accordingly we will not further consider it.

able in that year. *See Rickey v. Commissioner*, 502 F.2d 748, 753 (9th Cir. 1974).

Under the statute itself a taxpayer may report the taxable gain from the casual sale of personal property on the installment method only if in the taxable year of sale the purchaser's "payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price." I.R.C. § 453(b)(2)(A)(ii). If, however, the purchaser's year of sale payments are in the form of evidences of indebtedness of a third party, as opposed to that of the purchaser, the payments count toward the 30% limitation. *E. g., Freeman v. Commissioner*, 303 F.2d 580, 584 (8th Cir. 1962); 2 J. Mertens, *Law of Federal Income Taxation* § 15.18, at 61 (rev. 1974). The statutory distinction, however irrational or economically arbitrary, between a purchaser's indebtedness and a third party's indebtedness was made quite knowledgeably by Congress in the 1926 Revenue Act.[9] The legislative history

**9.** Senator Reed Smoot of Utah first introduced the distinction in a floor amendment while the Senate was considering H.R. 1, the bill that ultimately was enacted as the 1926 Revenue Act. Although the Senate Finance Committee had reported the bill favorably, its version had *not* included this distinction. But the Treasury Department proposed the floor amendment through Senator Smoot, and it had the Committee's approval. Prior to the amendment, the bill permitted installment treatment of casual sales of personal property only if the "initial payments," defined as "payments received in cash or property other than evidences of indebtedness," did not exceed one-fourth of the purchase price. Senator Smoot's amendment inserted "of the purchaser" after the word "indebtedness." The entire legislative history of the distinction appears to be the following discussion:

> THE CHIEF CLERK. On the same page, line 9, after the word "indebtedness," it is proposed to insert "of the purchaser," so as to read:
>
> As used in this subdivision the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable year in which the sale or other disposition is made.
>
> MR. SMOOT. Mr. President, I will make a brief statement as to what that is.
>
> This amendment provides that in computing the additional payment for the purpose of determining whether a deferred-payment contract is within or without the installment class there shall be included all evidences of indebtedness except those of the purchaser himself. For instance, Liberty bonds or notes of a third person are to be regarded as the equivalent of cash in determining the amount of the initial payment. In other words, this is to clear up the question of whether an installment plan of 25 per cent could be 10 per cent in cash and 20 per cent in Liberty bonds and then fall under the 25 per cent limitation. It simply includes Liberty bonds or notes of a third person which may be paid upon the installment plan.
>
> MR. KING. It includes them as cash?

> MR. SMOOT. Yes; it includes them as cash.
>
> THE VICE PRESIDENT. The question is on agreeing to the amendment offered by the Senator from Utah to the amendment of the committee.
>
> The amendment to the amendment was agreed to.

67 Cong.Rec. 3282 (1926). (In conference, the House, which had not included any provision for installment reporting in its version of the bill, accepted the Senate's provision with only a minor clarifying amendment. The conference committee report explains the general purpose of the installment provision but does not refer to the distinction at issue here. H.R.Rep.No. 356 (Conference Report), 69th Cong., 1st Sess. 32–33 (1926), reprinted in 1939–1 C.B. 363 (Part 2).)

It is possible that the phrase "of the purchaser" had been inadvertently omitted from the bill reported by the Senate Finance Committee. Its Report accompanying the bill explains:

> The application of the installment basis as provided in the committee amendment should eliminate necessity for appraisals of the obligations *of the purchaser* in deferred-payment sales, as required under the Board of Tax Appeals decisions, save in those cases where, because of a large initial payment, i. e., one in excess of 25 per cent of the price, the property sold and serving as security for the unpaid balance has a value adequate to give the obligations a market value.

S.Rep.No. 52, 69th Cong., 1st Sess. 19 (1926) (emphasis added), reprinted in 1939–1 C.B. 347 (Part 2). This explanation suggests that the Committee believed that obligations of the purchaser are more difficult to appraise than other kinds of cash or property, including, perhaps, obligations of third parties.

It is also possible that the Treasury Regulations prior to the 1926 Act treated a purchaser's and a third party's obligations differently. The regulations explain when, in sales of real estate and sales by dealers of personal property, "obligations of purchasers" may be reported on the installment basis or instead must be regarded as the equivalent of cash. *See, e. g.,* Treas.Reg. 45, Arts. 42, 44–46, T.D. 2831, 21 Treas.Dec.Int.Rev. 184–86 (1919). Perhaps the

of the distinction is sparse, however, *see* note 9 *supra*. Apparently the rationale for the distinction was that a purchaser's note might be more difficult to appraise, *see* S.Rep.No. 52, 69th Cong., 1st Sess. 19 (1926), *reprinted in* 1939–1 C.B. 347 (Part 2), or that third party notes were more marketable.[10] But another possible explanation for making the distinction is that a purchaser who furnishes his own note has a continuing obligation to pay, unlike a purchaser who furnishes a third party's note and thus completes his own payment obligation once he transfers the note to the seller. *Cf. Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 577–79, 97 S.Ct. 850, 51 L.Ed.2d 48 (1977) (corporate taxpayer's delivery of its promissory note to trustees of its qualified employees' profit-sharing trust was not something "paid" and therefore deductible under I.R.C. § 404(a) because taxpayer had made only a promise to pay, not an outlay of cash or property).[11]

Determining whether New American was the "purchaser" of the taxpayers' stock is complicated in this case by the problem of characterizing properly a corporate acquisition involving three parties. The taxpayers urge that the transaction was a sale of stock pursuant to a state law statutory merger, not a sale of assets followed by a liquidation, because the transaction did not comply with state law requirements for consummating a sale of assets.

But the proper tax treatment to be accorded this transaction depends upon how it should be characterized for purposes of I.R.C. § 453, not upon how it may be characterized for state law merger purposes. *Cf. Federal Bulk Carriers, Inc. v. Commissioner*, 558 F.2d 128, 130–31 (2d Cir. 1977) (whether sale of capital asset occurred is question of federal law); *Handelman v. Commissioner*, 509 F.2d 1067, 1070 (2d Cir. 1975) (same); *Wolder v. Commissioner*, 493 F.2d 608, 612 (2d Cir.) (federal not state law controls as to characterization of bequest for purposes of I.R.C. §§ 61(a), 102(a)), *cert. denied*, 419 U.S. 828, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974).

We agree with the court below and with the Commissioner that the transaction here, although carried out through the medium of a merger, in substance was a sale of assets coupled with a liquidation, not a direct sale of stock by shareholders to New American. We will assume, as taxpayers contend, that this transaction qualified under New York law, note 2 *supra*, as a statutory merger and did not consist of a sale, exchange, or other disposition of assets under § 909 of the New York Business Corporation Law.[12] *See Torrey Delivery, Inc. v. Chautauqua Truck Sales & Service, Inc.*, 47 A.D.2d 279, 283, 366 N.Y.S.2d 506, 510–11 (1975). We nevertheless conclude that as a matter of federal law, the transaction was a sale of assets, not a sale of stock. As Judge

---

reference to purchasers implies that third party obligations, by contrast, were always considered the equivalent of cash. But the regulations do not explicitly so state. Also, the rationale that the regulations offer for reporting some purchaser obligations on an installment basis—namely, that when initial payments are small compared to the residual obligation, there is more doubt whether the sales will be eventually carried out according to their terms—seems to have as much force for third party as for purchaser obligations.

**10.** One commentator interprets the remarks of Senator Smoot, *supra* note 9, as indicating "that Congress did not contemplate the third party note problem, but rather was intent upon not allowing income deferral through an installment method election when the seller receives more marketable evidences of third party indebtedness, such as Liberty Bonds." Emory, *The Installment Method of Reporting Income:*

*Its Election, Use, and Effect,* 53 Cornell L.Rev. 181, 249 (1968) (footnote omitted).

**11.** We note that in the Tax Reform Act of 1969, Pub.L. 91–172, § 412(a), 83 Stat. 608, inapplicable to this transaction, Congress amended § 453(b) by adding § 453(b)(3), which provides that even the purchaser's own readily marketable evidences of indebtedness or demand notes are treated like third party notes for purposes of the 30% limitation under § 453(b)(2). The rationale is that such instruments may be the practical equivalent of cash outlays. *See* H.Rep.No. 91–413 (Part 1). 91st Cong., 1st Sess. 107–08 (1969), *reprinted in* 1969–3 C.B. 267, U.S.Code Cong. & Admin.News 1969, p. 1645.

**12.** N.Y.Bus.Corp. Law § 909 (McKinney Supp. 1978).

Curtin pointed out, Oswego did not make any tender offers to individual shareholders, and individual shareholders could not elect whether to sell or retain their stock but could only vote for or against the plan of merger and liquidation. Once shareholders owning two-thirds of the outstanding shares voted in favor of the plan, under New York law an individual shareholder had only a right to receive a liquidation distribution. When the transaction was completed New American held the assets of Old American but not its shares, Old American no longer existed as a separate corporate entity, and New American had absorbed Old American's business. Even more important, perhaps, if the transaction had been a simple sale of stock, New American need not have assumed Old American's liabilities.

It is also clear that the corporate parties to the transaction treated it as a sale of assets. Oswego was negotiating for the "acquisition of Steamship" and was interested in the assets and business of Old American; the transaction took the form of a state law merger and not a sale of assets mainly because Old American preferred to shift known and potential liabilities to Oswego and to avoid certain costs of liquidation. Old American did, of course, deliberately structure the transaction with the hope of obtaining favorable installment tax treatment for its shareholders, but it did so even as it reported the *corporate* aspect of the transaction as a sale of assets and liquidation, to take advantage of I.R.C. § 337, set out in note 6 *supra. See* Revenue Ruling 69–6, 1969–1, C.B. 104.[13]

Under § 337 a corporation does not recognize a gain or loss from the sale or exchange of property if, within a twelve-month period following the adoption of a plan of complete liquidation, liquidation actually occurs. It is difficult to imagine a case in which § 337 could apply to sales of property to a third party but in which the distributees of the liquidation may elect to report their gain from the very same sales by the installment method. To justify such a result, one must characterize the liquidating corporation as the seller for purposes of I.R.C. § 337 but consider the shareholder as the seller for purposes of I.R.C. § 453(b)(2)(A)(ii). Moreover, because § 337 requires a liquidation within twelve months of a plan, the property which the liquidating corporation distributes to shareholders (other than evidences of indebtedness of the corporation itself) would in most cases constitute "payments" in the year of the disposition of the stock under I.R.C. § 453(b)(2)(A)(ii).[14] *Cf. Freeman v. Commissioner, supra* (reaching similar conclusion about the interaction of I.R.C. §§ 331(a)(1) and 453(b)(2)(A)(ii)). For both of these reasons the invocation of § 337 here is inconsistent with the invocation of § 453. The taxpayers would avoid this dilemma by denying that § 337 applies to the corporate transaction. But we are persuaded that § 337 is much more clearly applicable to the inter-corporate transfers than § 453 is to the stock transfer.

The fact that Oswego did not physically deliver its cash and notes to Old American thus becomes not relevant to the question who was the purchaser and seller, *cf. Raybestos-Manhattan, Inc. v. United States,* 296 U.S. 60, 63–64, 56 S.Ct. 63, 80 L.Ed. 44 (1935) (assessing tax on transfer of stock despite lack of delivery); *U. S. Industrial Chemicals, Inc. v. Johnson,* 181 F.2d 413,

---

**13.** In emphasizing that the transaction was a state law statutory merger, the taxpayers seem to suggest that the merger also qualifies as a tax-free reorganization under I.R.C. § 368(a)(1)(A). If the transaction did so qualify, their argument that Old American did not sell its assets to New American would have considerable merit. But § 368 is inapplicable because the shareholders of Old American, the acquired corporation, do not retain a substantial, continuing interest in the entity resulting from the acquisition. *See, e. g., Southwest*

*Natural Gas Co. v. Commissioner,* 189 F.2d 332 (5th Cir.), *cert. denied,* 342 U.S. 860, 72 S.Ct. 88, 96 L.Ed. 647 (1951).

**14.** Emory, *supra* note 10 at 206, notes that in some cases the liquidation might straddle two taxable periods of the distributee shareholders, permitting installment treatment under I.R.C. § 453 notwithstanding the applicability of § 337 to the transaction. But that is not the situation here.

415–16 (2d Cir. 1950) (same), for a transaction amounting in substance to a sale may be treated as such even if the consideration is only paid indirectly. *See* 3B J. Mertens, *supra*, § 22.92, at 626 (rev. 1973) (whether sale of exchange of capital asset occurred is determined from the substance not the form of the transaction). Similarly irrelevant is the absence of Old American as an express party to post-acquisition agreements between New American and its escrow agents and trustees pertaining to the stock transactions, for all of these documents were executed pursuant to the plan of merger and liquidation that Old American had approved.

Taxpayers refer to *Frizzelle Farms, Inc. v. Commissioner*, 61 T.C. 737 (1974), *aff'd per curiam*, 511 F.2d 1009 (4th Cir. 1975), concerning the propriety of a stockholder's election to report on the installment method gains realized upon the exchange of his stock in the acquired corporation for warrants and debentures of the acquiring corporation pursuant to a state law merger. In that case, the taxpayers note, the Government did not argue that the transaction should be deemed a sale of assets, but instead, successfully challenged the election to proceed on the installment basis on the ground that the warrants alone had a value in excess of 30% of the selling price. 61 T.C. at 741. The fact that there the Government did not argue that the acquiring corporation was not the "purchaser" of the stock does not, however, preclude it from raising that argument here. *See Estate of Sanford v. Commissioner*, 308 U.S. 39, 49–51, 60 S.Ct. 51, 84 L.Ed. 20 (1939) (court is not bound to accept stipulations as to questions of law).

Similarly, *SEC v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), relied upon by the taxpayers, is not relevant. That case merely held that there was a "purchase or sale" of a security within the meaning of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). Here too there was such a "sale" of stock by the taxpayers to Old American by virtue of I.R.C. § 331, which treats amounts distributed in complete liquidation "as in full payment in exchange for the stock."

The taxpayers' position is not without appeal. Although the stockholders did not individually negotiate the sale of their stock to New American, they did vote on the plan that provided for the sale; and thus they directly participated in forming the commercial transaction at issue here. But we conclude that this participation is insufficient to establish that New American, rather than Old American, "purchased" their stock within the meaning of § 453. The statutory distinction between notes of the purchaser and notes of a third party does not appear to be based on any compelling policy or economic reality. It is, however, the distinction that Congress has drawn, and we are bound to enforce it.

Judgment affirmed.