303 F.2d 580
 Mercedes Frances FREEMAN et al., Trust, The Citizens Bank, Trustee; Leila B. Freeman; Leila B. Freeman et al., Trust, The Citizens Bank, Trustee, and Flavius B. Freeman and Frances L. Freeman, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 16910.
 United States Court of Appeals Eighth Circuit.
 May 31, 1962.
 
 1
 Flavius B. Freeman, of Neale, Newman, Bradshaw, Freeman & Neale, Springfield, Mo., for petitioner, and O. J. Taylor, Springfield, Mo., with him on the brief.
 
 
 2
 Burt J. Adams, Atty., Dept. of Justice, Washington, D. C., for respondent and Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., and Lee A. Jackson, Joseph Kovner and John A. Bailey, Attys., Dept. of Justice, Washington, D. C., with him on the brief.
 
 
 3
 Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and HENLEY, District Judge.
 
 
 4
 HENLEY, District Judge.
 
 
 5
 This is a joint petition by several taxpayers for review of decisions of the Tax Court upholding a determination of the Commissioner of Internal Revenue that petitioners were not entitled to report for income tax purposes capital gains derived by them in 1956 in connection with the liquidation of the Springfield Baptist Hospital Association, Springfield, Missouri, on the installment basis authorized under certain conditions by section 453 of the 1954 Internal Revenue Code, 26 U.S.C.A. § 453. The opinion of the Tax Court, together with undisputed findings of fact, is reported as Freeman v. Commissioner at 36 T.C. No. 77. The facts necessary to decision here are summarized as follows:
 
 
 6
 In 1904 there was established at Springfield a hospital owned by a Missouri corporation known as the Springfield Baptist Hospital Association, hereinafter called the Association. The hospital was operated as a business for profit from 1904 until early in 1956 when it was converted into a non-profit institution to be operated by a newly-formed corporation known as the Springfield Baptist Hospital. During the period from 1904 to 1956 the Association earned profits consistently and paid dividends to its stockholders, who, in the main, were doctors, widows of doctors, certain Baptist organizations, and Baptist laymen.
 
 
 7
 For several years consideration was given by the stockholders to converting the hospital into a non-profit institution. No definite action was taken until December 1955 when information was received which indicated that if such a conversion should take place the hospital would be eligible for a substantial grant from the Ford Foundation. It was believed that the grant could be obtained if the hospital achieved non-profit status and filed its application for the grant not later than March 15, 1956.[1]
 
 
 8
 Those in control of the Association determined to proceed expeditiously with the conversion, and to permit the group which was to operate the contemplated non-profit institution to acquire the Association's plant and equipment on liberal credit terms and for a price much below the market value of the assets to be transferred to the non-profit group. On December 27, 1955, the Association's board of directors resolved formally that the conversion should take place, and a special meeting of stockholders was called for January 10, 1956.
 
 
 9
 The group that was to operate the hospital on a non-profit basis was already in existence by December 1955, and by letter dated December 28, 1955, that group was advised by the Association that the Association's assets could be acquired by the group for $231,200. The group was not required to make any downpayment, but was to execute a note payable over a period of ten years and bearing four percent interest.
 
 
 10
 Having decided upon the conversion, it remained for the Association to determine the method whereby the conversion was to be carried out. It is undisputed that under Missouri law there were two methods by which the desired result could be accomplished. Under one method, authorized by the Missouri Not For Profit Corporation Act, RSMo 1959, § 355.020, V.A.M.S., the stockholders would simply surrender their stock to the corporation and appropriate changes would be made in the Association's articles so as to convert it into a non-profit corporation. The other method involved the organization of a new corporation of a non-profit nature which would acquire the assets of the Association, such acquisition to be followed by a liquidation of the Association and its eventual dissolution.
 
 
 11
 The Association's board of directors at the December 27, 1955, meeting evidently had the first of the methods in mind, because on January 1, 1956, the Association's president wrote the Internal Revenue Service requesting a ruling on the proposed conversion which, according to the letter, was to be accomplished by a redemption of the outstanding stock of the Association. The letter inquired whether gains resulting to the shareholders as a result of the conversion would be considered capital gains and, if so, whether they could be reported on the installment basis.
 
 
 12
 On January 19, 1956, the Internal Revenue Service wrote to the Association advising that if the proposed redemption took place, and if such redemption was in complete termination of each stockholder's interest in the stock, and if the stockholders held the stock for investment purposes, gain or loss on the redemption would constitute capital gain or loss. As to reporting capital gain on the installment basis the Internal Revenue Service stated:
 
 
 13
 "The Corporation will issue pro rata to its stockholders in full payment in exchange for their stock approximately $92,500 out of its cash and investments, and will issue a mortgage note in the amount of $227,500, payable $22,750 annually with interest at 4%."
 
 The Service stated further:
 
 14
 "If the payments received by each stockholder for his stock in the taxable year of the exchange do not exceed 30 percent of the selling price, and the selling price exceeds $1,000, such transaction will qualify as a casual sale of personal property within the meaning of section 453(b) of the 1954 Code. If the election to report the transaction on the installment basis is made in a timely filed return, each stockholder may return as income in any taxable year that portion of such installment payments received in that year in reduction of the principal indebtedness which the gross profit to be realized when payment is completed bears to the total contract price."
 
 
 15
 In the meantime, however, the Association, without waiting for the requested ruling, had changed its mind about how the conversion was to be effected, and had determined not to undertake the conversion under the Not For Profit Corporation Act, but simply to dissolve the Association under the general corporation laws of Missouri after selling the Association's assets to a new corporation to be set up by the group which was to operate the hospital on a non-profit basis.
 
 
 16
 This change of plan was made at the special meeting of the stockholders held on January 10, 1956, and a new stockholders' meeting was called for January 24, 1956, for the purpose of considering the alternate plan. The reason for the change in method was that in order to make a conversion under the Not For Profit Corporation Act the consent of all of the stockholders was required, and such consent was not then immediately available. Under the other method the Association could be liquidated with the approval of 75 percent of the shareholders, which approval was available at the time.
 
 
 17
 At the January 24 meeting the Association determined to sell the hospital to the non-profit corporation and to take its note in payment. It was resolved that thereafter the Association was to be liquidated under the general laws of Missouri, that its debts were to be paid, and that remaining assets were to be distributed to the stockholders either in cash or in kind. Following this liquidation the Association was to be dissolved formally and would cease to exist.[2]
 
 
 18
 The sale by the Association to the non-profit corporation was consummated on February 1, 1956, by the execution and exchange of appropriate instruments. Among those instruments was a promissory note dated February 1, 1956, executed by the purchasing corporation in favor of trustees for stockholders of the Association in the principal amount of $231,200 with interest at the rate of four percent per annum. The trustees held the note under a declaration of trust which had as its purpose and intent "to hold title to the note and security therefor * * * as well as any other assets which are owned by said shareholders as a result of the dissolution of said [Association] but which cannot be actually collected and distributed to the shareholders within a period of twelve months from the date of the adoption of the plan of complete liquidation, and this trust is set up so that complete distribution of all assets shall and can be made within the twelve month period as provided for in said plan for complete liquidation." The beneficiaries of the trust were the shareholders of the Association. Each shareholder was given a certificate of participation in the trust equivalent to the number of shares held in the Association. Liquidation of the Association was completed on or about November 1, 1956, and ultimately the stockholders received in that year their beneficial interests in the note held for them in trust and cash distributions totaling $92,500. It is to be observed that the note received by the trustees was made by the new corporation and not by the Association.
 
 
 19
 While the liquidation was in progress, the Association advised the Internal Revenue Service of the methods which had been pursued finally in making the conversion and requested a ruling as to the tax consequences thereof. On January 23, 1957, the Service, taking the position that the note held in trust was to be included in the "initial payments," advised that section 453 of the Code was not applicable, and that the stockholders would not be entitled to report their gains from the disposition of their stock on the installment basis.
 
 
 20
 Petitioners did not accede to the view of the Service and, when they filed their 1956 income tax returns, reported their gains as an installment sale. They treated only their respective portions of the cash distributed, $250 per share, as having been received in 1956. The Commissioner determined deficiencies which are not disputed as far as amounts are concerned and, as stated, the Tax Court upheld the Commissioner.
 
 
 21
 The statute in question, insofar as here pertinent, provides in substance that a capital gain derived from a casual sale of personal property on the installment plan may be reported in installments if the selling price exceeds $1,000 and if in the taxable year of the sale no payments are received, or if the payments which are received, "exclusive of evidences of indebtedness of the purchaser," do not exceed 30 percent of the selling price. 26 U.S.C.A. §§ 453(a), 453(b) (1) (B), 453 (b) (2) (A) (i) and (ii).
 
 
 22
 In connection with the applicability of section 453 to the transactions here involved the Tax Court wrote:
 
 
 23
 "Section 331(a) (1) of the 1954 Code provides that amounts distributed in complete liquidation of a corporation shall be treated as full payment in exchange for the stock. In the case before us, the association was the liquidating corporation; therefore, it was the purchaser. The association distributed the note of [the new corporation] to the trust and the petitioners (as stockholders of the association) were given trust certificates in proportion to their stockholdings. The `evidence of indebtedness' received by petitioners was not that of the purchaser as required by section 453(b) (2) (A) (ii), but that of [the new corporation], a third party. Since the note was not an `evidence of indebtedness of the purchaser,' it must be considered part of the payment made in 1956; hence, the payments in 1956 exceed 30 percent of the selling price. See Caldwell v. United States, 114 F.2d 995 (C.A.3, 1940); Georgia-Florida Land Co., 16 B.T.A. 1253 (1929); J. W. Elmore, 15 B.T.A. 1210 (1929). Accordingly, the provisions of section 453 have not been met and the respondent's determination is sustained."
 
 
 24
 Petitioners do not challenge the conclusion of the Tax Court that if regard is had to the particular method employed to bring about the conversion of the hospital from a profit to a non-profit corporation, and to bring about the liquidation of the Association and the satisfaction of the claims of the stockholders, the requirements of section 453 were not met.
 
 
 25
 Petitioners do contend, as they contended before the Tax Court, that the means used by them accomplished the same ultimate result that would have been accomplished had they followed the original plan whereby the Association would have redeemed their stock and issued its ten-year installment note. They urge that we, preferring substance to form, should look to the ultimate result attained rather than to the means and methods of attainment, and hold that the gain realized from the disposition of the stock should be treated as though there had been a full and technical compliance with the requirements of section 453.
 
 
 26
 While this contention may not be without some equitable appeal, we agree with the Tax Court that it is without legal merit. It is quite true that in matters of tax liability, as in other fields, substance is generally to be preferred to form. But it is not correct to say that the form which a transaction takes is unimportant from the standpoint of tax liability. Indeed, in many instances, the form of a transaction is determinative of tax consequences. If a taxpayer having a choice of methods of accomplishing an economic or business result pursues a particular means to accomplish his ends, he must abide the tax consequences resulting from his choice of methods, even though had he made another choice the tax consequences would have been less severe or even nonexistent. United States v. Cumberland Public Service Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251; Miller v. Commissioner, 8 Cir., 295 F.2d 538; Woodworth v. Commissioner, 6 Cir., 218 F.2d 719; Barber v. United States, 8 Cir., 215 F.2d 663; Woodruff v. Commissioner, 5 Cir., 131 F.2d 429. That principle is applicable here and requires that the decision of the Tax Court be affirmed.
 
 
 
 Notes:
 
 
 [1]
 On March 12, 1956, the Ford Foundation advised that the grant would not be made since the hospital was not a non-profit charitable institution and did not enjoy tax exemption on December 12, 1955
 
 
 [2]
 The Court is advised that at the January 24 stockholders meeting the ruling of the Internal Revenue Service was discussed, and the Association's accountant advised the stockholders that in his opinion it made no difference from a tax standpoint whether the conversion was effected by one method or whether it was brought about by the other, since the ultimate result to be achieved was the same