BENJAMIN D. HYMAN and ELEANOR M. HYMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hyman v. Commissioner
Docket No. 1253-85.
United States Tax Court
T.C. Memo 1987-224; 1987 Tax Ct. Memo LEXIS 223; 53 T.C.M. (CCH) 727; T.C.M. (RIA) 87224; April 30, 1987. Joseph D. Edwards and Jeffrey M. Dean, for the petitioners. J. Michael Melvin, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' [1] Federal income taxes in the amounts and for the years as follows: Year Ending
Deficiency
December 31, 1979
$274,041
December 31, 1980
96,570
*224 After concessions by petitioner, the issues remaining for decision are: (1)(a) Whether a transaction in form a sale by Benjamin D. Hyman (petitioner) in 1979 of an undivided interest in a tract of real property was in substance in whole or in part a sale; (b) if the transaction was only in part a sale, what portion if any of the stated sales price was in substance a payment for the property interest sold; (c) what was the basis of the property interest, if any, to be sold and the amount of gain received from the sale; and (d) was such gain, if any, ordinary income or capital gain. (2) Whether $397,981.96 received by an attorney in 1979 pursuant to a document captioned "Assignment" was constructively received by petitioner in 1979. (3) Did the assignment in 1979 of $200,000 of mortgage proceeds constitute a payment to petitioner in that year? (4) May petitioner utilize the installment sales method of reporting gain provided for by section 453? [2]
*225 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Tampa, Florida at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1979 and 1980 with the Internal Revenue Service Center in Atlanta, Georgia. Each of these returns was filed on the cash basis method of accounting. At all times relevant to this case, petitioner was an attorney, practicing in Tampa, Florida. In 1975, Ruth Graves was a client of petitioner. Mrs. Graves owned a large tract of land (approximately 262 acres) on which she had her residence and operated a sod farm. In 1975 Mrs. Graves was overextended on loans made to herself individually and to Progressive Manufacturing Company (Progressive), a corporation in which her son, Robert Graves, had an interest. Mrs. Graves had signed the loans to Progressive as a guarantor and mortgaged her farm to secure the loans. There were also mortgages on the farm securing loans made to Mrs. Graves personally. Early in 1975 Progressive was unable to make payments on its loans and the banks looked to Mrs. Graves and her farm to *226 satisfy the debt. Mrs. Graves contacted petitioner for assistance in avoiding foreclosure. Petitioner had substantial experience in mortgage foreclosures. Ordinarily if petitioner had a client facing foreclosure on property he would try to work out an arrangement with the mortgage holders. If he was unable to reach an agreement with the mortgage holders, he would attempt to refinance the property, and as a last resort, would try to get someone to participate in ownership of the property in return for making the necessary mortgage payments. Petitioner advised Mrs. Graves to seek someone to pay the mortgage debts on her farm for an ownership participation but Mrs. Graves told him she could find no one with whom to make such an arrangement. Petitioner then offered to advance funds to Mrs. Graves to see her through her period of financial difficulty and advised her to seek independent counsel before executing an agreement with him with respect to the arrangement. Petitioner agreed to advance funds to Mrs. Graves in accordance with an "Agreement" dated April 29, 1975. The April 29, 1975, "Agreement" between Mrs. Graves and petitioner provided in part that petitioner would: *227 A. make all payments necessary to maintain the existing mortgages in a current status or to arrange refinancing of existing mortgages, and to thereafter maintain said mortgages in a current status until such time as part or all of said property is sold; B. furnish such funds as he shall deem reasonable and necessary for the planting, growing and harvesting of crops to be grown on said property; C. receive a 15% undivided fee simple interest in the property and shall be entitled to receive 15% of the total sales price of the property when it is sold. Upon the sale of all or part of said property, Hyman shall be reimbursed for all mortgage or other payments made by him for the benefit of the property; said payments to be evidenced by checks drawn to Ruth H. Graves. In addition, Promissory Notes shall be executed by Ruth H. Graves covering receipt of said payments, bearing interest at the rate of 9 1/2% per annum. It is understood that any cash obtained from the sale of the property shall be first applied to the repayment of existing mortgages if required, and to Hyman for monies advanced before any distribution shall be made to Graves or to Hyman for their respective fee *228 simple interest.
D. be entitled to take all interest deductions for income tax purposes resulting from payments made by him and which are allocated to interest expenses by the various mortgagees. E. be entitled to take and deduct as expenses for income tax purposes sums advanced for the planting, growing and harvesting of crops on the property. All such expenses paid or incurred by Hyman in connection with crop production shall also bear interest at the rate of 9 1/2% per annum, and shall be repaid out of crop sales before any other payments are made. Hyman shall receive 15% of the gross proceeds realized from the sale of all crops.
The agreement further provided that: Graves shall: A. convey to Hyman by Warranty Deed a 15% undivided fee simple interest in the property; B. place the property on the market for sale and make every reasonable effort to effect a sale of all or part of the property on such terms and conditions as shall be reasonable under the circumstances existing at the time of such sale; C. execute all papers that may be required or necessary to effect the sale or refinancing of the property; it being the intention of the parties that refinancing *229 of the property should be accomplished at the earliest practicable date. D. be totally responsible for the actual planting, cultivating and harvesting of all crops grown on the property, and shall have absolute discretion in the manner in which the crops shall be planted, grown and harvested. E. additionally keep and maintain whatever records that may be required for the accounting of all income and expenditures incurred in connection with the production of crops from the property. Concurrent with the execution of the April 29, 1975, agreement, Mrs. Graves executed an "Indenture" which by its terms conveyed to petitioner an undivided 15 percent interest in her farm property. This deed was recorded in the land records of Hillsborough County on November 14, 1975. Petitioner did not include any amount as income on his 1975 income tax return as the value of the 15 percent interest in the farm transferred to him in 1975. As advances were made under the April 29, 1975, agreement, promissory notes were executed by Mrs. Graves as contemplated by the agreement. During 1979 Mrs. Graves found a prospective purchaser for the farm property. By Purchase and Sale Agreement dated July 10, 1979, Mrs. *230 Graves and petitioner agreed to sell the property to James W. Roberts, Jr., as nominee of Federated Department Stores (Federated) for a total price of $2,800,000. Closing was to be in 90 days. Subsequent to July 10, 1979, Mrs. Graves engaged a CPA, Richard W. Beagles, to review petitioner's records of advances and disbursements to determine the total amount owed to petitioner under the 1975 agreement. By letter dated November 15, 1979, Mr. Beagles advised petitioner that he was in substantial agreement with petitioner's records with respect to the amounts advanced to Mrs. Graves under the terms of the 1975 agreement. He stated, however, that he was uncertain as to whether the agreement would cover payments made on the Progressive note. Accordingly, Mr. Beagles advised petitioner that he had suggested to Mrs. Graves that she retain an attorney to render an opinion on this matter. At the time of receipt of the letter from Mr. Beagles, petitioner had paid approximately $200,000 on the Progressive mortgages. Following receipt of Mr. Beagles' letter, petitioner telephoned Mrs. Graves and suggested that she correct her accountant's misunderstanding as to the amounts due him. Shortly *231 thereafter, Mrs. Graves retained an attorney, Gary P. Gormin, to advise her regarding the coverage of the 1975 agreement. On or about November 26, 1979, Mr. Gormin and petitioner reached an agreement that Mrs. Graves would repay petitioner for monies advanced on the Progressive loans with accrued interest. However, due to continuing disagreements, petitioner refused to go forward with the sale to Federated. On or about November 29, 1979, petitioner offered to buy out Mrs. Graves' interest. By letter dated December 6, 1979, Mr. Gormin notified petitioner that his offer had been rejected. This letter further stated: In addition, this will further confirm your statement that you have no intention to go forward on the sale and meet the terms of the agreements with the above-named parties. This letter will serve as notice to you that my client feels you are presently in breach of the agreement dated April 29, 1975, between yourself and her. Your letter of November 16, 1979 indicating that you would not proceed with any further negotiations nor make any further payments in accordance with your agreement is a violation of the agreement of April 29, 1975. Your further statement *232 in your letter of November 16, 1979, and your statements of today's date further violate the agreement as my client has placed the property on the market for sale and has made every reasonable effort to effect a sale on terms and conditions which we deem reasonable under circumstances existing at this time and has executed all papers and documents necessary to effect such a sale. This action was taken with your prior approval and consent, both in your representative capacity and in your ownership capacity. This letter is to serve as notice to you that we have advised the purchasers of the property that my client stands ready, willing and able to proceed with the sale along the terms and conditions that have been previously provided to us and that we will hold you responsible personally for any damages accruing to our client arising from your breach of the April 29, 1975 agreement and the agreements for sale of the property. We have been advised that a closing has been scheduled for the offices of Harrison, Greene, Mann, Rowe, Stanton & Mastry for Monday, December 17, 1979, at 10:00 A.M. and the documents have been prepared and will be forwarded for our and your review. We assume *233 you will govern yourself accordingly in light of the terms of this letter. Petitioner received a letter dated December 7, 1979 from the law firm representing Federated addressed to him and to Mr. Gormin's law firm which read as follows: Reference is made to the following: 1. Purchase and Sale Agreement, dated July 10, 1979, between Ruth H. Graves and David Hyman, as sellers, and James W. Roberts, Jr., Inc., a Florida corporation, Nominee, as purchaser (the "Nominee"), hereafter referred to as the "Agreement", and which the Nominee's interest is in the process of being assigned to Federated; and 2. Modification of Purchase and Sale Agreement between the sellers and Nominee, which I forwarded to David Hyman by letter of November 16, 1979 (the "Modification"). It is my understanding that the law firm of Gormin, Geoghegan, Easley & Granese, P.A. now represents Mrs. Graves and that you, Dave, are representing yourself in this transaction. This firm represents both the Nominee and Federated. There is an apparent controversy between you, Dave, and Mrs. Graves of which I am not fully apprised. There is now likewise an apparent controversy between you, Dave and both the Nominee *234 and Federated regarding whether you are bound by the Agreement which was executed by you or the Modification which was not executed by you. This letter will not attempt to set forth the facts or law in support of any of the parties, in that such is not the intent of the letter. This letter does confirm my telephone conversations with each of you on Thursday, December 6, 1979, that each of you (and you, Ed, on behalf of Mrs. Graves) are agreeable to establishing a closing date of Thursday, December 27, 1979, to work towards consummation of the transaction. Both Federated and the Nominee are likewise agreeable to this. The previous date of Monday, December 17, 1979, was the date set forth in the Modification. It is my understanding that this will not be an admission or agreement by either of the sellers that the transaction will close or that either are bound by the Agreement or Modification or of any agreements or rights between the sellers. Likewise, this is not an admission or agreement by Federated or the Nominee that they were not ready, willing and able to close under the terms of the Agreement or Modification or that the sellers are not bound by the Agreement or Modification. *235 Rather, the deferment of the proposed closing date is meant solely to allow the sellers additional time to resolve the controversy between them. Accordingly, the deferment of such date shall be deemed to result from settlement negotiations between the parties, and thus shall not be admissible in evidence as reflecting the waiver of any party's rights as to any of the above controversies nor shall any party be deemed to have agreed to anything other than such deferral nor shall any party be estopped from asserting its position, in whole or in part, as to any such controversy by reason of such deferral. C.I. Mortgage Group, which is the seller of an adjacent tract to the Nominee (and which purchaser's interest is likewise being assigned to Federated), has verbally agreed to extend its agreement to sell the adjacent tract until December 27, 1979. However, its position must be verified in writing for this letter to have any force and effect whatsoever. If you are in agreement with the deferral of the closing date in the manner and on the conditions set forth above, kindly execute the enclosed copy of this letter and return same to me no later than Tuesday, December 11, 1979. Copies *236 of this letter must be executed by both of you and returned to me no later than such date for this letter to have any force and effect whatsoever. If either of you have any questions, please call me immediately. Under date of December 10, 1979 petitioner signed a statement at the bottom of the last page of this letter stating that the deferral was acceptable to him. By letter dated December 10, 1979, petitioner responded to Mr. Gormin's letter of December 6, 1979. In this letter petitioner stated as follows: I believe that a few remarks are in order in connection with your letter of December 6, 1979: 1. I am not obligated to close the Graves transaction on December 17, 1979, and accordingly do not intend at this point to proceed any further in this regard. 2. After our meeting on Monday, November 26, 1979, wherein you agreed that all funds advanced by me in connection with the Graves property were properly reimbursable, I then made interest payments to the Brandon State Bank on November 26, 1979 and November 29, 1979, and paid the 1979 real property taxes on November 30, 1979. Therefore, I take issue with your conclusions that I have breached my contract dated April 29, 1975 with *237 Ruth Graves. To the contrary, Mrs. Graves is the one who breached our agreement by failing to recognize and agree that substantial payments made by me on her behalf were valid as proper advancements made under our agreement. 3. During our telephone conversation on December 6, 1979, you indicated that a very substantial difference exists between figures that were furnished to me by my accountant and those produced by Mrs. Graves' accountant. In order to make a fair appraisal of this situation I would like to review Mr. Beagles figures and discuss in detail with him the manner in which he reached his conclusions. 4. Shortly after our conversation on December 6, 1979, Roy Harrell called and inquired about the status of the sale. I advised him that I did not intend to close on December 17, 1979, but that I had just started discussing a possible resolution of our problem with you, and suggested that we consider taking some additional time in order to resolve this situation. I also advised Roy Harrell that this time extension, if acceptable, would in no manner be considered as an admission of any type whatsoever and would not affect any of the parties legal status in the event *238 litigation ultimately ensued as a result of this matter. I believe that this accurately outlines the course of events since our last conversation. Please advise how you wish to proceed. Subsequent to December 10, 1979, Mr. Gormin and petitioner reached agreement that Mrs. Graves would buy out petitioner's interest in the property, thus permitting Mrs. Graves alone to close with Federated. Petitioner and his accountant met with Mr. Beagles on December 19, 1979, to discuss the details of the proposed buy out. Petitioner arrived at his asking price for the December 27, 1979, transaction by considering the following factors: $420,000.00
15% of Gross Sales Price
473,175.21
Payments on Mortgages and Accrued
Interest
179,552.63
Progressive Mortgage Balance and
Accrued Interest
3,105.59
15% of Farm Crop
1,269.21
Payment by Hyman to Brandon State
Bank 1979
89.75
Payment by Hyman to Brandon State
Bank 1979
10,027.27
Payment by Hyman to Hillsborough
County Tax Collector
100.00
Filing Fee paid by Hyman
15,000.00
Legal Fees due Hyman from April 1975
to Date of Sale
$1,102,319.66
2,302.36
Accrued Interest on the Above Amount
$1,104,622.02
Total Due Hyman by Graves
*239 On December 27, 1979, petitioner conveyed his interest in the Graves' property to Mrs. Graves. The contract for sale between petitioner and Mrs. Graves was dated December 27, 1979. The stated purchase price was $1,030,982. The contract provided with respect to payment of the purchase price and closing as follows: (b) Buyer shall, upon delivery of deed as hereinafter provided, execute and deliver to Seller a purchase money note and mortgage on said property in the amount of $929,622.00 bearing interest at 10% per annum, payable as follows: $729,622.00 and acc[sic] interest payable on or before 1/15/80, $100,000.00 plus accrued interest on or before 1/15/81 and 1/15/82. Said note and mortgage shall be in form reasonably satisfactory to Seller; shall contain an acceleration clause in the event of default by Buyer for thirty (30) days; shall give Buyer the right to prepay all or any part of the principal at any time or times with interest to date of payment only; * * * (c) Buyer shall pay to Seller in cash or cashier's or certified check, $101,360.00 (or such greater or lesser amount as may be required to complete payment of purchase price) upon delivery of deed as hereinafter *240 provided, upon which the above deposit shall apply as a part. * * * 3. Subject to the aforesaid curative period, this sale shall be closed and the deed shall be delivered on or before December 27, 1979, and Seller agrees to deliver occupancy and possession of said property to Buyer on or before December 27, 1979. The $1,104,622.02 sum agreed upon by petitioner and Mr. Gormin was not the $1,030,982 amount received by petitioner because, prior to the closing between himself and Mrs. Graves, petitioner donated portions of his interest in the property to two charities, Tampa Jewish Federation and Congregation Beth Israel. Each charity received $36,820 for a total charitable contribution of $73,640, reducing the total amount to be received by petitioner to $1,030,982.02. The sale by Mrs. Graves to Federated also took place on December 27, 1979. The Seller's closing statement showed the following: Sales Price
$2,800,000.00
Less Purchase Money Mortgage
1,988,000.00
812,000.00
Less: Title Insurance
$6,000.00    Commission See below *
State Stamps on Deed
11,2000.00    State Record 2 Deeds
20.00    1979 Taxes Credit 12/27/79
to 12/31/79
114.90 Cr.
Record S.M. six
24.00    Pay off Mortgage Fed Land Bank
71,463.88     *James W. Roberts, Jr. Inc.
24,360.00     *Coyle Pealty Inc.
24,360.00    Brandon State Bank
42,787.27    (5 loans)
Brandon State Bank
(Hold 5,725.04)
Record Affidavit
4.00    Survey
3,188.75    -189,018.04
$622,981.96
*241 Disbursement of part of proceeds authorized as follows: Gormin, Geoghegan, etc. Trust Acct.
$397,981.86
Ruth H. Graves
$ 35,000.00
Balance of Proceeds to be used
for purchase of outstanding
interest of David Hyman, et al
($ 6,900.00 Gormin)
($ 8,100.00 HB&C)
Federated executed a mortgage to insure the outstanding liabilities to Mrs. Graves in the amount of $1,988,000. Federated gave a promissory note to Mrs. Graves in the principal amount of $1,988,000 bearing 10 percent interest per annum. The note was to be paid as follows: on January 15, 1980, principal in the amount of $662,667 plus interest; on January 15, 1981, principal in the amount of $662,667 plus interest; and on January 15, 1982, principal in the amount of $662,666 plus interest. The mortgage and note called for in the contract of sale between petitioner and Mrs. Graves were to be security for the outstanding debt. Petitioner did not receive the note or the mortgage to secure this indebtedness. While the closing documents were being prepared, Mrs. Graves' attorney and petitioner realized that because this property was being transferred to Federated they could not work out a *242 way by which Mrs. Graves could give a mortgage on the property to petitioner to secure a note to him. Petitioner told Mr. Gormin that he wanted him to receive to hold in escrow any funds other than the agreed down payment which otherwise would be due him from the 1979 payments. On December 27, 1979, Mrs. Graves executed a document entitled "Assignment." This document provided in part as follows: ASSIGNMENT
I, RUTH H. GRAVES, as assignor herein, for value received, hereby sell, assign, transfer and set over to GARY P. GORMIN, ESQUIRE, * * * assignee herein, the net proceeds of that certain sale between myself and Federated Department Stores occurring on December 27, 1979 and the proceeds for that certain note and mortgage executed by Federated Department Stores in my favor dated December 27, 1979 in the principal amount of ONE MILLION NINE HUNDRED EIGHTY-EIGHT THOUSAND AND NO/100 DOLLARS, ($1,988,000.00). NOW, THEREFORE, in consideration of the premises, the parties agree that: 1. Escrow of Net Proceeds of Closing. Assignor hereby agrees that following disbursement of proceeds by ChelseaTitle and Guaranty Company from the above referenced sale, the remaining proceeds *243 shall be disbursed to assignee who shall place said funds in an interest bearing escrow amount. On or about January 2, 1980, the assignee shall disburse all remaining funds and accrued interest to David Hyman, as payment for the purchase of interest in the subject property. 2. Escrow of Proceeds of Note and Mortgage. Assignor hereby agrees that Federated Department Stores shall pay over to assignee the sums due to her on January 15, 1980 and assignor shall deposit such funds in escrow and disburse as soon as practicable as follows: a. The remaining balance of sums due and owing to David Hyman arising from his sale in the subject property to the assignor, exclusive of $200,000.00 which sum shall be disbursed in accordance with a partial Assignment of Mortgage Proceeds dated December 27, 1979. * * * c. The balance of the net proceeds to the assignor. 3. Escrow and Disbursement of Proceeds for January 15, 1981 and January 15, 1982 of Note and Mortgage. Assignor hereby agrees that Federated Department Stores shall pay over to assignee the sums due to her on January 15, 1981 and January 15, 1982 and assignor shall deposit such funds in escrow and disburse as soon *244 as practicable as follows: a. On January 15, 1981 and January 15, 1982, the assignee shall disburse to David Hyman the sum of $200,000.00 in accordance with the terms of a Partial Assignment of Mortgage Proceeds dated December 27, 1979. * * * c. The balance of all proceeds remaining on each of the dates as set forth to the assignor. Federated paid the cash due on closing by check which was turned over to Mr. Gormin and placed by him in an account the funds from which were available on December 31, 1979. This account bore interest at the rate of 11 percent. The amount of $397,981.96 from the closing proceeds was held by Mr. Gormin to be paid over to petitioner. On December 27, 1979, Mrs. Graves executed to petitioner a "Partial Assignment of Mortgage Proceeds." The partial assignment of mortgage proceeds provided in part as follows: I, RUTH GRAVES, * * *, assignor herein, for value received, hereby sell, assign, transfer and set over to DAVID HYMAN, * * *, assignee herein, the sum of Two Hundred Thousand ($200,000.00) Dollars, with interest at the rate of ten (10%) percent per annum, which said sum is a portion of the amount to become due me on payment of that certain *245 mortgage, a copy of which is attached hereto and made a part hereof. Payment of said $200,000.00, which is secured pursuant to this Assignment, shall be as follows: On January 15, 1981, the principal sum of One Hundred Thousand ($100,000.00) Dollars, plus accrued interest. On January 15, 1982, the principal sum of One Hundred Thousand ($100,000.00) Dollars, plus accrued interest. Further, assignor hereby makes, constitutes and appoints assignee her attorney in fact, irrevocably, in her name or otherwise but at the expense of assignee, to have, use and take all lawful means for the recovery of the principal and interest up to the amount of $200,000.00 secured by the aforesaid mortgage, and in case of payment to discharge the mortgage as fully as assignor might, or could, do if this Assignment were not made. On May 12, 1980, Mrs. Graves executed to petitioner a "Partial Assignment of Mortgage." On January 15, 1980, Mr. Gormin received the payment due Mrs. Graves from Federated. From these funds and the money he had received at the closing, Mr. Gormin made the payment due petitioner in the amount of $729,622 together with accrued interest. On January 18, 1980, Mr. Gormin *246 transmitted an additional two days' interest to petitioner because the payment had not been received by petitioner until January 17, 1980. On January 18, 1982, petitioner reconveyed to Mrs. Graves the interest in the Federated mortgage which was conveyed to him pursuant to the partial assignment of mortgage executed on May 12, 1980. The total amount petitioner advanced to Mrs. Graves was $549,805 of which he had deducted $180,251 on prior returns. The parties agree that petitioner's basis for computing income or gain is $369,554 ($549,805 minus $180,251) and that his income or gain is to be computed as follows: Total amount received:
$1,104,622.02
Less basis
369,554.00
735,068.02
Petitioner on his 1979 Federal income tax return [3] reported a $67,020 gain from "Improved Real Estate -- Graves Property" on the installment basis under section 453 [4] computed as follows: [SEE ILLUSTRATION IN ORIGINAL] *247 Petitioner on his 1980 Federal income tax return reported a capital gain on the sale of "Improved Real Estate -- Graves Property" of $482,432 computed as follows: GROSS PROFIT PERCENTAGE
Profit to be realized
681694.
divided by
Contract price
1030982.
equals
Gross Profit Percentage
66.12084
SCHEDULE OF RECEIPTS
Principal
Total
Ordinary
Capital
Year
Receipts
Gain
Gain
Gain
1979
101360.
67020.
67020.
1980
729522.
482432.
482432.
Respondent in his notice of deficiency determined that petitioner received ordinary income of $403,428 in 1979 and $331,640 in 1980 computed as follows: Taxable income in 1979: Amounts received in 1979: Cash at closing
$175,000
Escrowed proceeds (constructive receipt)
397,982
Assignment-Federated Department Store note
200,000
Total received in 1979
$772,982
Less Basis
369,554
Ordinary income in 1979
$403,428
Taxable income in 1980: Net ordinary gain
$735,068
Less amounts properly reportable in 1979
403,428
Ordinary income in 1980
$331,640
OPINION Respondent contends that the entire amount received by petitioner from his transactions *248 with Mrs. Graves, other than repayment of loan advances, should be characterized as interest from a loan transaction and therefore constitutes ordinary income to petitioner. Respondent's position is that this ordinary income cannot be converted to capital gain by the signing of documents designating this right to receive income as a sale of a property interest. Petitioner contends that the entire amount he received from his transaction with Mrs. Graves was the sales price of his undivided 15 percent interest in real property which he had held for more than one year. Petitioner thus contends that the $735,068.02 difference in the sales price of his property interest, $1,104,622.02, and his basis, $369,544, is taxable as long-term capital gain. Petitioner on brief proposes that if this Court does not agree that the entire $735,068.02 is long-term capital gain, the transaction should be bifurcated into two separate transactions (1) the sale of his 15 percent interest in the property for $420,000 and (2) the repayment of money advanced under the 1975 agreement with interest. Respondent bases his argument that the money petitioner received is ordinary income in the form of interest *249 on his conclusion that petitioner received his 15 percent equity interest as security for the advances of funds for Mrs. Graves' benefit in accordance with the 1975 agreement. Based on this analysis, respondent contends that there was no sale or exchange of a capital asset by petitioner in 1974 and accordingly no capital gain on the transaction. We agree with respondent that a taxpayer may not convert ordinary interest income to capital gain by attempting to transform the repayment of a loan into the sale of a capital asset. O'Hare v. Commissioner,641 F.2d 83 (2d Cir. 1981), affg. a Memorandum Opinion of this Court, cert. denied 454 U.S. 829 (1981); Real Estate Investment Trust v. Commissioner,334 F.2d 986 (1st Cir. 1964), affg. 40 T.C. 921 (1963), cert. denied 381 U.S. 911 (1965). However, the facts here clearly show that petitioner did, in 1975, receive a capital asset within the meaning of section 1221 in the form of his 15 percent undivided interest in the Graves property. The cases cited by respondent for the proposition that courts have treated as disguised loans the transfer of an equity interest *250 to a lender where the original owner subsequently repurchases, are so factually distinguishable from the situation present in this case as to be inapposite. Here the 1975 agreement was for the transfer to petitioner of a 15 percent undivided interest in property. The deed which was recorded clearly made a transfer of that property. In O'Hare v. Commissioner,supra, the Court concluded that the transaction was a loan rather than the sale of a capital asset and denied capital gain treatment. On the facts there present we concluded that the taxpayer had merely extended his credit in return for a fee, that he had no intention of buying property in his own right, and thus held title merely as part of a loan transaction until the property could be reconveyed to the seller when a third party buyer was found. The amount the taxpayer was to receive in payment upon the reconveyance was based on the length of time he held title to the property. The Second Circuit in its affirmance added that it was very unlikely that a true owner would have agreed to a profit based on timing of a sale rather than based on sales proceeds. Similarly in Comtel Corp. v. Commissioner,45 T.C. 294 (1965), *251 affd. 376 F.2d 791 (2d Cir. 1967), also relied on by respondent, the taxpayer, Comtel, entered into a transaction purporting to be a stock purchase from Zeckendorf Hotel Corporation followed by a resale some seven months later at a substantial gain. We concluded that in substance the entire transaction was a loan. The Second Circuit emphasized five findings of fact in its affirmance: (1) Zeckendorf never intended for Comtel to be the true owner and never lacked the desire to acquire the stock; (2) Comtel was not permitted to sell or otherwise dispose of the stock; (3) the Comtel investors were interested in neither hotel ownership nor operation but rather desired a high yield, low risk investment; (4) the resale price had two variables, both indicative of compensation for the use of money -- interest on principal and Comtel's expenses; and (5) the Comtel profit was dependent not on the appreciated value of the stock but on a prearranged option price. Unlike O'Hare or Comtel, petitioner intended to be the true record holder of title; he was not prohibited from selling or otherwise disposing of his interest, and in fact he gave away a percentage of it in the *252 form of two charitable contributions; he did not enter the transaction for financing purposes but as a true owner who would benefit from the appreciation in value of the property; the resale price was determined not as a fee based on the holding period or prearranged option price, indicative of interest, but rather was in the form that a true owner would demand -- a percentage of the proceeds. In addition, petitioner paid all amounts due on the substantial mortgages on the property and all other expenses associated with the property including expenses incurred in the production of sod which enabled the property to generate income. Respondent is correct in noting that each case turns upon its own facts, Comtel Corp. v. Commissioner,supra, but in this case the facts do not indicate the true substance was a loan. On the contrary, the facts indicate petitioner was the true owner of a 15 percent undivided interest in the Graves property. Petitioner's uncontradicted testimony is that he regularly counseled clients facing foreclosure to, as a last resort, seek third party investors who would assume responsibility for the payment of mortgage debts in return for an *253 undivided percentage interest in the property and repayment of all advances. The facts in this case simply do not support respondent's argument that the entire transaction was a disguised loan. The facts do, however, support a conclusion that there was in part a loan transaction and in part a sales transaction. Petitioner cannot reasonably expect to have capital gain treatment for payment of mortgage debts and other expenses and the interest on such advances, for attorney's fees and for interest on the outstanding balance he claims is due him. Therefore, the two transactions must be bifurcated and a determination made of how much of the amounts received at closing, from the claimed escrow and by assignment of mortgage proceeds, were, for tax purposes, received in the years 1979, 1980, 1981 and 1982 and to what extent these amounts constitute capital gain, ordinary income, or return of capital. First, we must determine the amount of petitioner's basis, if any, in the undivided 15 percent interest in the property. Clearly he received $420,000 for his property interest which is 15 percent of the $2,800,000 sales price of the entire property. His gain is of course this sales price *254 less his basis in the property. Petitioner included no value for this 15 percent interest on his income tax return for the year he received the property, 1975. The year 1975 is not in issue here. However, in determining petitioner's capital gain on the sale of his 15 percent we must consider whether he did in fact have a basis in the property. Neither petitioner nor respondent produced evidence of the value, if any, of this property interest in 1975. Petitioner testified that in 1975 there were outstanding mortgages on the property in approximately the following amounts: Progressive Manufacturing Co.
$350,000
Federal Land Bank
90,000
Pan American Bank
100,000
Brandon State Bank
200,000
Total
$740,000
In 1975 Mrs. Graves could get no further loans on the property and faced its loss by foreclosure. Although petitioner knew that there was discussion of Interstate 75 going by this property, that portion of the Interstate was not then under construction. The property was offered for sale in 1975, but was not sold until 1979. Considering all these facts, we conclude that the record does not support a present value in 1975 as distinguished from a potential *255 value of petitioner's 15 percent undivided interest in the heavily incumbered Graves property. We have concluded that petitioner received a capital asset in the form of his 15 percent undivided interest in the property which had only a potential value in 1975. Since we conclude that the amount realized on the sale of petitioner's 15 percent interest was $420,000, this is the amount of petitioner's long-term capital gain. The remaining $684,622 of the amount received by petitioner in the transaction less the $369,554 return of capital to petitioner or $315,068 is ordinary income to petitioner. In order to determine how much of each of these amounts must be reported in each year it is necessary to address the remaining issues of whether there was a constructive receipt by petitioner of $397,000 in 1979, the year of receipt of money or money's worth from the assignment of mortgage proceeds, and the use of the installment sales method to report the gain from the sale of petitioner's interest in real property. Respondent contends the amount of $397,982 was placed in escrow for petitioner in 1979 at his request at a time when it was subject to his control. For this reason respondent *256 contends that this $397,982 was constructively received by petitioner in 1979 and should have been reported as income in that year. Respondent relies on section 451(a) which requires inclusion in gross income of all amounts received by a taxpayer in a taxable year and section 1.451-1(a), Income Tax Regs., requiring inclusion of an amount in income when actually or constructively received. Respondent argues that this issue turns upon whether the $397,982 was security in the event of a default by Mrs. Graves, and therefore subject to a substantial limitation or restriction, [5] or whether the amount was intended as payment of Mrs. Graves' debt to petitioner. Respondent notes that where amounts are placed in escrow merely to serve as security in the event of a debtor default, the amounts placed in escrow will not be deemed received on establishment on the escrow. Sprague v. United States,627 F.2d 1044 (10th Cir. 1980); Porterfield v. Commissioner,73 T.C. 91 (1979). *257 Respondent, however, argues that when payments are made into a trust or escrow account and such payments will be used to meet the debtor's obligations to the creditor, those payments are deemed received when paid into the account. Trivett v. Commissioner,611 F.2d 655 (6th Cir. 1979), affg. a Memorandum Opinion of this court; Williams v. United States,219 F.2d 523 (5th Cir. 1955); Oden v. Commissioner,56 T.C. 569 (1971); Pozzi v. Commissioner,49 T.C. 119 (1967). Respondent looks to the terms of the assignment agreement between Mrs. Graves and her attorney which states that the proceeds of the Federated sale not used for other specified purposes should be disbursed to Mr. Gormin who "shall place such funds in an interest bearing escrow account to be disbursed to petitioner as payment for the purchase of his interest in the subject property". From this statement respondent concludes that the funds were to be used as payment of Mrs. Graves' obligation and thus were constructively received by petitioner. Respondent argues that since in 1979 petitioner received more than a mere contract right to payment of the *258 remaining $929,622 to which he was entitled he is required to include as income in that year the $397,981.96 paid by Federated as a part of the purchase price of the property. Respondent argues that the facts of this case show a self-imposed limitation by petitioner on receipt of the $397,981.96. Respondent equates the facts here to the facts in Oden v. Commissioner,supra, in which the taxpayer's rights to certificates of deposit were not restricted by the escrow arrangement; to Pozzi v. Commissioner,supra, in which it was concluded that the escrow was made solely at the behest of the taxpayers and thus was a self-imposed limitation; to Williams v. United States,supra, involving a self-imposed limitation by the taxpayer on his receipt of fully available income; and to Trivett v. Commissioner,supra, where the taxpayer obtained substantial ownership rights and consequently an economic benefit from the certificates of deposit. Petitioner contends that since the $397,981.96 was not made available to him until 1980 when he received a payment of some $729,622 with interest, as called for in his sales *259 contract with Mrs. Graves, there was no constructive receipt. To support his argument, petitioner states that the assignment agreement was a replacement of the purchase money note and mortgage for which he contracted with Mrs. Graves to insure payment of the deferred portion of the purchase price. He further contends that the agreement was made prior to the time he had any right to the proceeds from the sale, and before he sold his interest to Mrs. Graves. Petitioner contends that since he was a cash basis taxpayer he did not receive the $397,982 until Mr. Gormin distributed the $729,622 to him with interest of $5,093.82 accrued between December 27, 1979 and January 15, 1980. [6]
Petitioner contends that respondent's argument ignores the rules of constructive receipt set forth in section 1.451-2(a), Income Tax Regs., where income is not constructively received until it is "credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time", or "if the taxpayer's control of its receipt *260 is subject to no substantial limitations or restrictions." According to petitioner, in 1979 he was prohibited from receiving any of the deferred balance and consequently this was a substantial limitation or restriction preventing constructive receipt. Petitioner relies on Reed v. Commissioner,723 F.2d 138 (1st Cir. 1983), revg. a Memorandum Opinion of this Court. The record here shows that after petitioner and Mrs. Graves had signed a contract to sell the Graves property to Federated a dispute developed between them as to the amount of the proceeds to be paid to petitioner. The 1975 agreement provided that when the property was sold petitioner was to receive 15 percent of the sales price of the property for his 15 percent undivided interest and be reimbursed for his advances for mortgage payments and operation of the farm with 9-1/2 percent interest. There was no provision in the 1975 agreement with respect to attorney's fees to be paid to petitioner. The 1975 agreement also provided that the first receipts were to be used to pay off mortgages and to reimburse petitioner for his advances. The original dispute between petitioner and Mrs. Graves concerned whether *261 the 1979 agreement covered approximately $200,000 petitioner had paid on the Progressive mortgages on which Mrs. Graves was guarantor and the farm was security. This matter was settled between the parties and in addition it was agreed that petitioner would receive a $15,000 attorney's fee. As part of the settlement of their dispute the parties agreed that the transaction would be framed as a sale by petitioner of his interest in the property to Mrs. Graves with petitioner to receive a down payment in 1979 and notes and a mortgage to secure the balance of $929,622 which was to be paid in the following years. While we have held that this agreement was ineffectual to convert an amount representing interest income into capital gain, it was a binding agreement between the parties as to payment to petitioner. Petitioner modified his right under the 1975 contract to be reimbursed for his advances out of the first payments after the mortgages were paid off in return for recognition by Mrs. Graves of his right to receive the amount of his advances with the Progressive mortgage and attorney's fees. If the contract for the note and mortgage to secure the $929,622 payment had been carried *262 out there would have been an agreed deferred payment of a part of the purchase price. However, when the final papers were being drawn it became apparent that Mrs. Graves could not grant a mortgage on the property since the property was being sold to Federated to produce the funds to pay petitioner as well as Mrs. Graves. At that juncture petitioner suggested that the funds be paid to Mrs. Graves' lawyer to be held for payment to him in 1980. Mrs. Graves then made an assignment of the proceeds of the Federated sale to her attorney, Mr. Gormin, to be paid by him to petitioner in 1980. The mortgages still on the property had been paid off with 1979 proceeds. In our view the assignment to Mr. Gormin substituted for the note and mortgage which it was not possible for Mrs. Graves to give to petitioner. This factual situation is different from the type of "escrow" cases relied on by respondent and is also factually distinguishable from Reed v. Commissioner,supra, relied on by petitioner. This is merely a case of parties agreeing to a deferred payment of part of the sales price to be received for property and then finding it necessary to substitute a different arrangement *263 for the note and mortgage which was to secure the deferred payment. In this respect this case is comparable to the situation in Schniers v. Commissioner,69 T.C. 511 (1977) and cases discussed therein at pages 516-517. We therefore hold that petitioner did not constructively receive in 1979 the $397,982 paid over to Mr. Gormin in that year. Respondent contends that petitioner received $200,000 in 1979 by the assignment of mortgage proceeds to him in that year. Petitioner argues that the $200,000, represented by the assignment to him in 1979 of mortgage proceeds should not be included in his income for that year because the assignment was intended merely to serve as security for the payment of Mrs. Graves' obligation in that amount to him. Whether an assignment of a third party obligation is security for another's indebtedness or payment of a debt depends on the facts and circumstances surrounding the transaction. If the facts show that the third party obligations are transferred in satisfaction of the buyer's obligation to pay and the seller is to look only to those third party obligations for payment, the assignment of the third party obligations constitutes *264 payment of the debt by and receipt of income from the seller. Sprague v. United States,627 F.2d 1044, 1049 (10th Cir. 1980). Petitioner contends that the facts and circumstances in this case indicate that the assignment was not intended as payment and therefore there is no income from the assignment to him in 1979 of an obligation which is a cash equivalent, relying on Sprague v. United States,supra.[7]
*265 In Sprague v. United States,supra, the Court determined that the letters of credit involved were given as security for the payment of notes and could only be drawn on upon default by the purchaser on his notes. The distinction in letter of credit and certificate of deposit cases such as those relied upon by petitioner here and the Court in the Sprague case and the facts in the instant case lies in the economic substance of the transaction. Where the facts show that the purchaser's payment obligation was terminated so that in substance the seller was looking to another source for payment, letters of credit or certificates of deposit have been held to constitute payment. See Griffith v. Commissioner,73 T.C. 933 (1980); Pozzi v. Commissioner,49 T.C. 119 (1967); Oden v. Commissioner,56 T.C. 569 (1971). Cf. Porterfield v. Commissioner,73 T.C. 91 (1979), where we held that certificates of deposit which were intended by the parties only as security did not constitute payment. In the instant case unlike in the Sprague case, after the assignment the "purchaser" (Mrs. Graves), was relieved *266 of her continuing obligation to pay the "seller" (petitioner). In this case payment from the third party, Federated, was not conditioned upon Mrs. Graves' default. On the contrary, petitioner looked to and expected to be paid from the assignment. The record fails to explain whether, when, and from whom petitioner did, in fact, receive payment for the $200,000 obligation which was the subject of the assignment of the Federated mortgage. Since the record indicates petitioner reconveyed the assigned mortgage to Mrs. Graves in January, 1982 presumably he was paid. As we recently reiterated in Davis v. Commissioner,88 T.C. 122, 143 (1987): The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. * * * This is especially true where, as here, the party failing to produce the evidence has the burden of proof or the other party to the proceeding has established a prima facie case. * * * [Wichita Terminal Elevator Co., v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).] *267 Respondent contends that it is well settled that the receipt of a transferable third party obligation is income in the year of receipt. Watson v. Commissioner,613 F.2d 594 (5th Cir. 1980), affg. 69 T.C. 544 (1978); Freeman v. Commissioner,303 F.2d 580 (8th Cir. 1962), affg. 36 T.C. 779 (1961); Holmes v. Commissioner,55 T.C. 53 (1970); Georgia-Florida Land Co. v. Commissioner,16 B.T.A. 1253 (1929). We agree with respondent that it is well settled that transferable third-party obligations of a solvent obligor are to be included in income in the year received. On the facts here present we conclude that petitioner did in fact receive a cash equivalent by the assignment to him of $200,000 of the obligations of Federated. See Watson v. Commissioner,supra;Freeman v. Commissioner,supra;West Shore Fuel, Inc. v. United States,598 F.2d 1236 (2d Cir. 1979). Respondent contends the mortgage assignment should be valued at the full face value. He argues that petitioner, having produced no evidence of a lesser value, has failed *268 to rebut the presumption of correctness which attaches to respondent's determinations. Rule 142(a). Petitioner argues that this is not a question of value but whether the assignment was security or payment. Because we have concluded the assignment was a cash equivalent, thus payment, it is necessary to determine the value of the cash equivalent received. The Supreme Court has stated that "negotiable notes are regarded as the equivalent of cash receipts, to the extent of their fair market value, for the purposes of recognition of income." Schlude v. Commissioner,372 U.S. 128, 136 n. 10 (1963). Thus under the authority of Schlude we hold the fair market value of the assigned mortgage is properly includable in petitioner's 1979 income. The obligations here involved bore interest at the rate of 10 percent, which was the highest legal interest rate in Florida at that time and were from a very solvent debtor. Based on these facts, we conclude that the fair market value of these notes was approximately equal to their face value. We hold that the fair market value of the assigned notes is includable in petitioner's 1979 income and that under the facts of this case *269 the face value of the notes is their fair market value. Petitioner argues that if he and Mrs. Graves had intended the assignments to constitute payment, she would have on her 1979 income tax return reported the assignment as the disposition of an installment obligation. Petitioner contends that since the record has no evidence of Mrs. Graves' having done this, the implication is an intention for the transaction to be merely security. Based on our conclusions that the receipt of the mortgage assignment did constitute payment, we will not fully address this argument. However, it should be noted that there is no evidence that Mrs. Graves did not report the transaction as the disposition of an installment obligation. In our view the terms of the assignment whereby Mrs. Graves did (1) "sell, assign, transfer and set over to David Hyman" the sum of $200,000.00 of proceeds due her from Federated, and (2) appoint petitioner her attorney in fact authorized to pursue recovery of the interest and principal, and to discharge the mortgages as fully and completely as she could have had the assignment not been made, along with petitioner's testimony that he looked to the assignment for payment, *270 support the conclusion that Mrs. Graves had so parted with the incidents of ownership that she had disposed of her installment obligation and not merely placed it as security. Based on the foregoing discussion we conclude that petitioner had 1979 receipts from the transaction with respect to the Graves property of $375,000 composed of the $175,000 cash on closing and charitable contribution payments, plus the $200,000 assignment of mortgage proceeds. In 1980 petitioner had receipts other than current interest of $729,622 from the Graves transaction which was the amount paid to him on January 15, 1980. Finally, it is necessary to determine to what extent, if any, petitioner is entitled to report any of the gain or income on the installment basis. Section 453(b) applicable to the year 1979 provides for reporting income from the sale of real property or a casual sale of personal property on the installment basis where there are no payments in the year of sale or the payments in that year exclusive of evidences of indebtedness of the purchaser do not exceed 30 percent of the selling price. We have held that petitioner in 1979 made a sale of his 15 percent undivided interest in the *271 Graves farm for $420,000 and also entered into an agreement which in substance covered his reimbursement for funds he had advanced with interest thereon. Although the form used for the repayment of petitioner's advances with interest was designated a "sale" we have concluded that in substance it was a return of the capital he advanced and receipt of ordinary income in the form of attorney's fees and interest. Therefore, the only amount to which the installment sale provisions could be applicable is the sale of petitioner's real property interest for $420,000. The problem is the allocation of the $375,000 we have held that petitioner received in 1979 between the real property sale and the return of money advanced with interest thereon and attorney's fees. Under the 1975 agreement between petitioner and Mrs. Graves, petitioner's first payments would be a return of his advances. However, in discussing whether petitioner constructively received $397,462 in 1979 we concluded that the December 1979, agreement for sale of property between petitioner and Mrs. Graves replaced the method of payment provisions of the 1975 agreement. Since the nature of this 1979 agreement was in the form *272 of the entire payment being for petitioner's 15 percent undivided interest in the Graves farm, no provision was made as to how the 1979 payment would be apportioned. In the absence of such an agreement, we conclude that the $375,000 received by petitioner in 1979 should be allocated among the items which it discharged in part on a pro-rata basis. When this apportionment is made, it is obvious that petitioner has received in 1979 more than 30 percent of the sales price of $420,000 for the real property he sold and therefore does not qualify for the installment sale provisions of section 453(b). [8] He is therefore required to include the entire capital gain on the sale of his 15-percent interest in the Graves farm in his 1979 income. The amount of $729,000 received by petitioner *273 in 1980 from the transaction here involved shall be apportioned in a manner similar to the apportionment of the 1979 receipt to determine the ordinary income reportable by petitioner in 1980. Since petitioner's entire capital gain is reportable in 1979, the portion of the 1980 receipt allocable to the sale of petitioner's 15-percent undivided interest in the Graves farm is not again taxable in the year 1980. Decision will be entered under Rule 155.
Footnotes
1. Hereinafter petitioner will refer solely to Benjamin D. Hyman.↩
2. Unless otherwise indicated all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue and all rule references are to the Tax Court Rules of Practice and Procedure.↩
3. On his 1979 return petitioner also claimed the two charitable deductions of $36,820 each ($73,640 total) with the explanation that each gift was made on December 21, 1979, of a 1/200 interest in real property valued at fair market value. It appears that to arrive at the value used petitioner considered the value of a 15 percent interest in the property to be $1,104,622. Also to reconcile the closing statement on the closing of Mrs. Graves' sale to Federated it appears that the $73,640 was paid to the charities from the 1979 cash proceeds of the closing from the following computation: ↩
$397,981.86
to Mr. Gormin
101,360.00
to petitioner
35,000.00
to Mrs. Graves
6,900.00
to Mr. Gormin
8,100.00
to HB-C
$549,341.86
$622,981.96
cash received at
closing
549,341.86
$ 73,640.10
Assigned to
charities
4. Sec. 453(b) provides as follows: SEC. 453. INSTALLMENT METHOD. (b) Sales of Realty and Casual Sales of Personalty. -- (1) General Rule. -- Income from -- (A) a sale or other disposition of real property, or (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000. (2) Limitation. -- Paragraph (1) shall apply only if in the taxable year of the sale or other disposition -- (A) there are no payments, or (B) the payment (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price. (3) Purchaser evidences of indebtedness payable on demand or readily tradable. -- In applying this subsection, a bond or other evidence of indebtedness which is payable on demand, or which is issued by a corporation or a government or political subdivision thereof (A) with interest coupons attached or in registered form (other than one in registered form which the taxpayer establishes will not be readily tradable in an established securities market), or (B) in any other form designed to render such bond or other evidence of indebtedness readily tradable in an established securities market, shall not be treated as an evidence of indebtedness of the purchaser.↩
5. Sec. 1.451-2(a), Income Tax Regs.↩, states in pertinent part: "income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions."
6. Because of a delay in receiving the proceeds from Federated, January 17, 1980, Gormin transferred an additional two days' interest to petitioner.↩
7. Petitioner relies primarily on Korstad v. Commissioner,T.C. Memo. 1983-147. In Korstad the issue was whether the taxpayer's receipt of a bank letter of credit was a year of sale "payment" so that the taxpayer exceeded the 30 percent limitation of section 453(b) and thus was disqualified from installment reporting. The taxpayer had agreed to sell real property on an installment basis. For business reasons the purchaser required title be transferred to it on closing. In order for the taxpayer to have some security against buyer default, the purchase agreement was amended to secure the installments with an irrevocable letter of credit. The purchaser signed an unsecured demand note to the bank and the bank issued the letter of credit to the taxpayer. In order to draw upon the letter of credit, which was assignable, the taxpayer was required to provide the bank with a statement that he had not been paid by purchaser. For four consecutive years purchaser defaulted on payment to the taxpayer who then drew on the letter of credit. In the fifth year, the taxpayer received payment from purchaser, but it had been advanced directly from the bank. The taxpayer reported the sale on the installment basis but respondent contended the fair market value of the letter of credit was year of sale income. This Court noted that it has concluded letters of credit were cash equivalents and thus "payments" where in substance the letter of credit was "the economic substitute for the obligation" instead of security for the purchaser's obligation. Korstad v. Commissioner,45 TCM 1032, 1034, 52 P-H Memo T.C. par. 83,147 (1983). See Griffith v. Commissioner,73 T.C. 933 (1980). We concluded under the facts in the Korstad case that the installment sale and letter of credit were motivated by valid business reasons, the deferred payment arrangement was not established simply to enable taxpayer to use installment reporting and since taxpayer could not draw upon the letter of credit unless and until purchaser defaulted, the letter of credit served as security and not as payment. For reasons stated herein, we find Korstad↩ distinguishable from the instant case.
8. Based on this formula 420,000
1,104,622 of the $375,000 should be considered as the 1979 payment on the sales price of petitioner's 15 percent undivided interest in the Graves farm. Likewise $369,000
1,104,000 of the $375,000 should be considered a return of capital and the balance ordinary income. The details of the apportionment to each individual item may be made by the parties.↩